Good morning, everyone, and welcome to the Ninth Circuit. We'll take the cases in the order on the day sheet. The first case for argument is Jeremy Conklin v. Univ. of Wash. Medicine. Good morning, Your Honors. May it please the Court, Aaron Orheim, here appearing on behalf of the appellant, Dr. Jeremy Conklin. I'd like to save three minutes for rebuttal, if I may, and I'll be watching my time. Thank you. This Court should reverse where Dr. Conklin more than met the low-bar pleading requirements for his antitrust claim, where he alleged that UW conspired with MD certifying boards and entities to restrict access to DO-trained physicians from accessing the CCS fellowship program at UW Medical School. Not only is this restriction in the free market and reduction in consumer choice the exact type of antitrust injury that the Sherman Act is designed to prevent, but it violates clear Washington law prohibiting discrimination against osteopaths at all levels, including in educational and training privileges. Is there any injury to competition or harm to competition other than lessening consumer choice? So is there, I mean, looking at the cases, they talk about impact on output and price, impact on services, impact on quality. Are there any of those injuries? Well, we might find those injuries, Your Honor, once we get to the discovery portion of this case, but this case was dismissed as a 12B6 motion. Well, but did you plead those injuries? I think, Your Honor, arguably no, but in there is that the restriction on consumer choice, again, the injuries cited by Your Honor just now come from Rebel Oil. That's a case cited by UW in this case. And subsequent decisions by this court, including in Amaral and Tektronix, have said only looking at those aspects, those antitrust injuries, is too restrictive. That's from Tektronix. So the district court said that the theory of the plaintiff's case was that there wasn't a material difference between DOs and MDs. Is that, was the district court incorrect? Yes, Your Honor. Well, the material difference is that consumers get to choose what's the best care for themselves. But so the quality issue, I thought the argument was there wasn't any difference in quality, at least for this market for seraphic, I'm saying it wrong, for the surgical procedure at issue here. Well, again, Your Honor, that's too, I think it's, again, too restrictive to focus on the quality of the medical provider at issue. The question is what the consumer prefers, what the consumer wants, what the consumer is going to choose. And looking only at the- was consumer choice, less consumer choice. Is that correct? Yes, arguably yes, Your Honor. And, again, in Tektronix- And so is there a difference in product or availability if consumer choice is limited in this context? I think maybe the best evidence that there is, Your Honor, is the very fact that the anti-discrimination provision exists under Washington law and many other state laws is that there's obviously a public policy here that some consumers prefer- Well, putting that aside for antitrust purposes, normally when there's a lessening of consumer choice, it's material because it could cause prices to rise up, there might be a difference in quality. Is there anything of that sort here, or is it, how is it material in any way other than the policy? It's material because we're placing an artificial restriction on the free market. Consumers prefer, should have the choice of DOs or MDs. Many consumers prefer DOs. But they do have that choice. I mean, this wasn't changing, this wasn't actually changing the number of doctors that would ultimately be out in the free, in the market as MDs or DOs, was it? Again, Your Honor, looking at Tektronix, that doesn't matter. It doesn't matter if we have an actual market effect. The reduction in consumer choice alone is an antitrust infringement. Why would it be a reduction in consumer choice? All you're saying is, I mean, what you want, I see, you wanted to have one extra, sorry, I'm going to get it wrong, OD as opposed to MD with your client. And, again, it's not just one extra here, Your Honor. In Summit Health and cases like Oltz and Haan. Well, yeah, but you haven't alleged that others were denied because of this policy. We're alleging that there's a categorical exclusion of DOs, that there's an artificial restraint on the market where DOs must have this arbitrary certification from an MD board when state law, Medicare, and the anti-discrimination provisions in Washington law recognize that they are functionally equivalent and there shouldn't be no artificial restraint in the market here. And even though we don't have to show a market effect, we have alleged that there's only less than, there's just a fraction of a percent of all cardiac surgeons in the country. Forty-eight, no, excuse me, 28 of the 44,000, 4,400 are DOs. One performs CCS surgery. If you want a DO to perform CCS surgery in the country. But if there's no difference between their performance of it, what difference does that make to the market? Because some... Do prices go up? Is there any change in price or quality? I didn't see those allegations. But you're saying that's not necessary? It's not necessary. It's not, excuse me. Okay. Yeah. I looked at the other cases that you cited, McCreed, Ian, Amaral, and although they mention the limiting consumer choice, it's always in the context of rise in prices or hurting competition. And it wasn't clear to me how this particular decision was having that effect. Well, I will say we did allege in the complaint the harm to competition, that it harms these DO programs that train DO surgeons that should be recognized just in the same light as MD programs. And how does that hurt competition with respect to output or quality or anything like that? Because if you want to perform in a CCS fellowship, you have to follow the MD path. And, again, that restricts consumer choice. It restricts access. And when we get to the discovery stage, we might show, indeed, that that raises prices or does something else. But we don't have that information yet without the benefit of discovery. Can I ask about the causation here? Because isn't it true that had your client chosen an ACGME-accredited residency that this wouldn't have become an issue? He could have still gone out and performed? Well, he did complete some ACGME training, Your Honor. He also completed some osteopathic training. And they said you have to have only the ACGME training. You have to have only the MD training. But I thought if he had finished an ACGME-accredited residency that he then – I didn't realize it was – so you're saying that it was an exclusionary. You had to have only one. You couldn't have both. Correct. So if he went back and did an ACGME-accredited residency. But in the complaint we've alleged – Is that in the record that he couldn't have done both? Why couldn't he have done the other residency? I didn't see that in the record. I guess if we go back to the start, he could have attended an MD medical school, Your Honor. But we have in the record that he's – Well, but I'm asking. I understand. Yeah. But he can't have – he can't now go back and retrain. That's in the complaint. The Medicare system won't allow that, won't provide the funds for that. And it's in the record that he can't – I mean, the problem here is that he's certified under the DO boards for these exact same standards, these standards that should apply universally under federal and state laws, and they didn't in this case. You want to save the rest of your time? I would like to save the rest of my time. Thank you. Okay. Good morning, Your Honors. May it please the Court, I'm Steve Rumage, and I'm appearing this morning on behalf of the Appellate Aid Provider Defendants. And, Your Honors, Judge Lasnik was absolutely correct when he decided that Dr. Conklin had not stated a claim based on his failure to get the one available CCS fellowship at UW Medical School. I'm going to talk about both the antitrust claim and time permitting the discrimination claim and basically plan to split my time evenly between the two of them. But since counsel spent all of his time on the antitrust claim, I'll focus first on that. So I want to begin with a simple and irrefutable proposition, which I think is implicit in all the argument that has occurred up to now, which is that antitrust laws protect competition, not competitors. So I'm just reading from Amaral. Another form of antitrust injury is coercive activity that prevents its victims from making free choices between market alternatives, which seems to support what opposing counsel is saying that lessening consumer choice is enough. Well, it depends on what you mean by choice. Amaral, for example, is a situation where there was predatory pricing that was going on with the purpose of driving independent rice mills out of business. In other words, taking competitors in the market who were there, removing them from competition, and presumably, like most predatory pricing schemes, with the ultimate intent of recouping what you've lost in the predatory pricing by using monopolistic pricing thereafter. So that was a classic example where there is harm to competition pleaded. So the harm to competition that Mr. Orheim focused on in his argument was the alleged deprivation of consumer choice. But I think Your Honor focused on the important part of that, which is consumer choice to be meaningful in a competitive sense has to be a choice between different alternatives. And here, all that the complaint pleads is that there should have been a swapping out, that for this one available CCS fellowship, instead of there being an MD, it should have been a DO. That's it. There was actually no allegation in the entire complaint that there was any other DO who's ever wanted to get into a CCS fellowship and been denied. So this is the only one. And in terms of consumer choice, there was a repeated allegation that these two physicians, the DO and the MD, are equivalent. The opening brief says they are functionally equivalent. There's about 20 pages of the amended complaint that talks about how the board certification and training is equivalent. And most important, they are all trained through the same CCS fellowship. So when they get out there in the marketplace, they are the same training, same procedures, no allegation in the complaint that a doctor of osteopathy performs surgery on newborns any different than a doctor of medicine, an allopathic physician. I'm struggling a little bit with that because if that's the case, then why would the eligibility requirements for this particular fellowship make a distinction and only allow somebody who has the one type of accreditation to go through? That's actually in the complaint. And the reason is that Dr. Conson alleges in his complaint that you can't practice CCS surgery without board certification. Board certification in CCS surgery is only available through the American, I can't remember if it's the Board of Thoracic Surgeons, but it's the American College of Thoracic Surgeons, is the only entity that grants board certification. Dr. Conklin is not eligible through their requirements, not the requirements of the University of Washington, through their requirements is not eligible for board certification in CCS. So if we allowed somebody in who was not eligible for board certification, we'd essentially be training somebody who is then not eligible to go out in the marketplace and perform CCS services. So that's the simple answer. Would the plaintiff have an antitrust claim against the board that's refusing to certify him? Well, he originally named a lot of defendants and he's dropped those on his appeal. So I think the answer to that is a no for reasons I didn't get into. But it doesn't matter for our purposes. But it doesn't matter for our purposes. And I would ask, go ahead, sorry, Robert. What about this ACGME accredited residency? Is that, I mean, if he had chosen that, do you agree with what was represented here, that even if he had chosen that, it wouldn't have solved the problem? No, I mean, the complaint says that if he had chosen that, it would have solved the problem. The complaint says that if he had, after graduating as an osteopath from medical school, if he had chosen post-graduate education that was on the allopathic track, in other words, ACGME, that he would then have been eligible for certification by the thoracic surgeons. And then he would have been eligible for the CCS fellowship, which is why, Your Honor, we have one CCS certified osteopath and we have 28 physicians, osteopathic physicians, who are eligible for this fellowship. And that's all in the complaint. If that's true, does that in and of itself defeat the causation prong to allege an antitrust claim? Or am I thinking, am I trying to make too much of it? Well, I haven't thought of it in terms of causation, but the reason I haven't thought of it is to me I have this simplistic notion that if all you're doing is trading out competitors, there's no injury to competition, which case after case is held. But I would say that, yes, it certainly breaks the causal chain because it means that it's not a decision of the University of Washington that deprived Dr. Conklin of this opportunity. It is a career path that he chose. You know, Your Honor might have chosen to go, I don't want to personalize this, somebody might choose to go to a non-EBA accredited law school, and that may have consequences later on down the road for what their career opportunities are. And I hate to be blunt, but that's life. You know, that's the way life works. In this instance, what I think is important to remember is that there are a lot of cases out there which are largely ignored by Dr. Conklin that talk about this notion of trading out competitors. Lots of cases involving, for example, where there are exclusive arrangements between a hospital and a group of radiologists or a group of anesthetists, and that relationship is terminated and a new group comes in, and there's an allegation, well, that's an antitrust injury, that's a competitive injury. Case after case says, no, that's not a competitive injury. We have McCready in which there was a difference between psychiatrists and psychologists, and the court held that lessening the consumer choice there was also an antitrust injury. But that is an instance where, as Your Honor talked about it, Your Honor put it in terms of outputs, I would put it in terms of supply. In that instance, what the alleged antitrust violation was doing was compressing the available competitors to just psychiatrists and excluding a whole group that consumers could have chosen from. In this instance, there was one CCS fellowship available. And the only question is, does a DO get it or does an MD get it? It doesn't increase the supply to the consumer. It's just swapping out. And so as the Second Circuit put it in the Balaclava case that we talk about, from the consumer's point of view, nothing about the market has changed. There has been a mere reshuffling of competitors. There's no case from this circuit that uses those words, but the Tenth Circuit has said the same thing in Coffey. The Sixth Circuit district courts have said the same thing. All we're talking about here is a reshuffling, they hope, of DOs for MDs, which is not an effect on competition. It has an effect on osteopaths, and that's it. And I would add, Your Honor, that all of the cases they talk about, about exclusions, like, for example, McCready, are situations where there are specific allegations of harm to competition. The Hahn case, for example, which is out of this circuit, podiatrists said we're excluded from this, you know, medical plan. Well, in that case, the podiatrist specifically alleged that they charge less, that they charge less. So there is a price impact. And indeed, they talk about how the plan fixed prices to benefit MDs at the expense of podiatrists. Not our case here, not the allegations here. The Olds case, specific allegations that there were different procedures performed more cheaply by nurse anesthetists than by anesthesiologists, an impact on market not alleged here. And the Summit Health case, which they consistently cite and claim to be dispositive, well, in that case, the ophthalmologist, who was excluded from the market, specifically alleged, I do a procedure that is cheaper than what these guys do, and that's why they wanted to freeze me out. All of these cases have harmed competition alleged in a way that this case does not. So let me briefly, since I just have a minute, allude to the discrimination claim and tick through very quickly what we think are simple and dispositive answers to that claim. First, that statute, which Mr. Orheim correctly points out, prohibits certain kinds of discrimination against doctors of osteopathy, covers only, and I quote, doctors of osteopathy, quote, licensed under Chapter 18.57 RCW. At the time that Dr. Conklin applied for this fellowship, he was not licensed under RCW, 18.57 RCW, outside the scope of the statute. Second, sorry, Your Honor. Well, I was just going to say, I appreciate the point, but isn't the more fundamental point, it doesn't, maybe this is where you're going, it doesn't create a private right of action. I mean, that's, Judge Leisenick gave three reasons, and no private right of action is the one, and that's the one he spilled the most ink on, but frankly, I think it's because it's the more complicated of the three. But yes, there's no private right of action. But the rationale seems to be that his position was that the agency said they didn't have jurisdiction, but that's not how I read, that's not how I read what the, I read what the agency said to say there's no, there's no reason for an investigation here, not because specifically they didn't have jurisdiction. Well, I read it to say there's no reason for an investigation here because we don't cover fellowships, we don't cover educational training, and that's what I believe they said. Which goes to your first argument a little bit. Correct, it does, because it just means they're reading the statute exactly the same way we're reading the statute, because the second, actually the first one is he's not licensed. The second argument is it covers only applications to practice for a hospital, and there's no obligation that he applied to practice at a hospital. I see I'm out of time now, so unless the Court has additional questions for me, I'm happy to submit this, and we ask that Judge Leisenick be affirmed in all respects. Thank you. Thank you, Your Honor. Thank you, Your Honor. I'd like to turn to the anti-discrimination argument now. It's a misrepresentation of the record to say that the Department of Health said we don't investigate fellowships. That was the Washington Commission, a special commission that deals with physician misconduct that gave that answer. It was not the Department of Health speaking for the Department of Health as a whole. When the Department of Health spoke for the Department of Health as a whole, it was during the bill, when the bill was being signed, and they said, this has no fiscal impact on us. We don't, we're not the ones to be enforcing this statute. What they enforce are. Hold on. Didn't the Department of Health respond and say. In our reply brief, Your Honor, I make this distinction. Okay. And they reply on the statement of facts. They cited to a specific commission, a commission that deals with physician misconduct, who gave that answer. And that's the one that says, based on our review, we are closing this report without an investigation, because it does not write to the level of an investigation as it does not involve patient well-being. That's the Department of Health's answer, Your Honor. Yeah. The commission is the one that said, we don't deal with fellowships, because that commission deals specifically with physician misconduct. And so, Your Honor, again, and I want this, the point of this statute is an anti-discrimination statute. And we cite numerous cases in our briefs where private causes of action are inferred in anti-discrimination statutes. And in an important Washington case, Burnside v. Simpson Paper, the court looked at anti-discrimination laws, which by their own terms said these only apply to inhabitants of Washington State. And yet the court said, if you're an inhabitant of California applying for a job in Washington, these laws also apply to you. Inhabitants is far too restrictive. The purpose of the statute is to prevent discrimination. We must further and not frustrate that purpose by reading it so limited as to mean to only apply to Washingtonians. That's exactly the interpretation that UW is asking for here, that Dr. Coughlin had to have his license in hand before the statute's anti-discrimination protections applied to him. That's not the law. And also, the opposing counsel points to the language, has applied to practice with the hospital. And I cited numerous cases in my reply brief, Your Honor, in the statute, where it talks about how residents, fellows, and even students practice in hospitals. And again, we are reading these statutes together, reading them broadly. And there's specifically RCW 1857.040 subsection 8, 040 subsection 8, that says nothing in this chapter shall be construed to prohibit practice by osteopathic physician and surgeon serving a period of clinical postgraduate medical training in a postgraduate program approved by the board. So again, the purpose of this is to provide broadly to residents, fellows, we ask this court to reverse. Thank you very much. Thank you. I think we appreciate the arguments on both sides in the case of Jeremy Coughlin versus University of Washington Medicine is submitted.
judges: Ikuta, R. Nelson, Hunsaker